## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Sandra Rosemary Oldenburg, | ) | Bankruptcy Case No. 23-13858-JGR |
| Lee Michael Oldenburg | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Carlson Farms Homeowner's Association | ) | |
| , a Colorado nonprofit corporation. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No.: |
| | ) | |
| Sandra Oldenburg | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW, creditor Carlson Farms Homeowner's Association, a Colorado nonprofit corporation (the "**Association**"), by and through undersigned counsel, and, pursuant to 11 U.S.C. §§ 523(a)(2) & (a)(4), files this Complaint seeking a Judgment and an Order that the debt owed to it by Sandra Oldenburg ("**Debtor**") is non-dischargeable, and in support thereof states as follows:

### PARTIES & JURISDICTION

1. Association is a Colorado nonprofit corporation which has its principal office address in Larimer County, Colorado.

2. Sandra Oldenburg is an individual who resides at 4904 Silverwood Drive, Johnstown, Colorado 80534.

1

3. The Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334 and 11 U.S.C. § 523; this is a core proceeding. Venue is proper in this Court pursuant to 28 U.S.C. §1408 and §1409.

4. The Association consents to the entry of final orders and judgments by this Court on core and non-core matters.

## FACTS

5. The Association is the Homeowners Association affiliated with a residential community located in Johnstown, Colorado. This action seeks to compensate the Association for the damages it sustained as a result of the Defendant's fraud and theft.

6. The Association filed a lawsuit against Sandra Oldenburg and her company, NOCO Real Estate Solutions, Inc., d/b/a Poudre Property Services ("**PPS**"), *Carlson Farms Homeowners Association v. NOCO Real Estate Solutions, Inc., et al*, Case No. 23-CV-30125, Larimer County District Court, Judge Laurie K. Dean, on February 17, 2023, alleging claims for breach of contract, demand for accounting, money had and received, conversion, civil theft, and fraud. The First Amended Complaint is attached and incorporated herein as **Exhibit 1.**

7. In October 2023, the Association moved to amend the Complaint to add allegations against Ms. Oldenburg's father, John Bickerton, for his involvement in the activities that harmed the Association.

8. On November 7, 2023, Ms. Oldenburg filed a notice of Chapter 13 Bankruptcy with the Larimer County Court. The same day, the Court issued an Order, stating that it had reviewed the notice and would stay the case as to Defendant Sandra Oldenburg only.

9. On November 16, 2023, the Court granted the Association's motion to amend its Complaint to add John Bickerton as a defendant.

## GENERAL ALLEGATIONS

10. In 2007, the Association engaged PPS as its Agent and Property Manager. For all time periods relevant to this Complaint, Sandra Oldenburg was or is a principal and controlling figure behind PPS.

11. On January 1, 2007, the parties executed a Homeowners Association Management Agreement ("the **Agreement**").

12. The Agreement describes PPS' extensive obligations as Agent with respect to the Association's finances. These duties included, but were not limited to:

> **§2.1 Collection of Assessments.** Agent shall collect (and give receipts for, if necessary) all annual and other assessments and monies that are due the Association with respect to the Property …
>
> **§2.2 Records of Income and Expenditures.** Agent shall maintain records of all income and expenses relating to the Property, and shall submit to the Association on or before the twentieth (20th) day of the following month, a statement of receipts and disbursements for the preceding month, including a statement of the balance in the operating account for the Property.
>
> **§2.3 Preparation of Annual Budget.** Sixty (60) days prior to the Fall Association General Meeting, Agent shall prepare and submit to the Board a recommended Annual Budget for the next year showing anticipated income and expenses for the next year.
>
> **§2.4 Submission of Annual Report.** Within forty-five (45) days after the end of each fiscal year, Agent shall submit to the Association, a summary of all receipts and disbursements relating to the Property for the preceding year. HOWEVER, submission of such annual report shall not be construed to require Agent to supply an audit. Any audit required by the Association shall be prepared at the Association's expense by an auditor(s) of its choosing.
>
> …

**§2.6 Employment of Personnel.** Agent shall hire, pay, negotiate collective bargaining agreements with (if necessary), supervise, and discharge whatever personnel may be required to maintain and operate the Property on behalf of the Association and in accordance with the budget, job standards and wage rates previously approved by the Association …

**§2.7 Payment of Employment Taxes.** Agent shall, on behalf of the Association, execute and file all tax and other returns and do and perform all acts required of the Association as an employer under the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, all applicable federal, state and local income tax laws, and all other laws, regulations, and/or ordinances governing employment and payment of wage. Upon request, the Board shall promptly execute and deliver to the Association all necessary powers of attorney, notices of appointment and the like.

…

**§2.9 Payment of Expenses.** From the funds of the Association, Agent shall pay all expenses of the Property, including taxes, building and backflow inspection fee, water rates and other governmental charges, and all other charges or obligations incurred by the Association or by Agent on behalf of the Association with respect to the maintenance or operation of the Property or pursuant to the terms of this Agreement or pursuant to other authority granted by the Board on behalf of the Association.

**§2.10 Records of Insurance.** Agent shall maintain appropriate records of all insurance coverage for the Property carried by the Association …

Agreement at §§ 2.1-2.10.

13. PPS was precluded from making any "unbudgeted expenditures or include any nonrecurring contractual obligations exceeding five hundred dollars ($500.00) without the proper consent of the Association through the Board."

14. In addition, PPS was responsible for the disposition of Association funds, and required to keep the funds of the Association completely separate and apart from its own fund or the funds of "any others."

15. Further, PPS was responsible for paying "all expenses of operation and management of the Property" from the Association's funds.

16. Pursuant to the Agreement, PPS was obligated to obtain a bond for the Association's benefit for all employees who handled or were responsible for the safekeeping of the Association's monies. Agreement at §5.4.

17. In the alternative, PPS was required to obtain and maintain fidelity insurance coverage.

18. Upon termination of the Agreement, PPS was required to forward any balance of monies due to the Association and provide a final accounting, reflecting the balance of income and expenses with respect to the Property and "all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Property." Agreement at §5.10.

19. Pursuant to the Agreement, the Association paid PPS for its property management services.

20. On multiple occasions in 2021, Ms. Oldenburg provided written documentation to the Association, confirming that the Association had total cash balances in the approximate amount of $438,136.18 for the twelve-month period ending December 9, 2021.

21. The 2021 cash balance amount provided by Ms. Oldenburg were in line with cash balance amounts from earlier years. A 2020 Association Treasurer's report reported the Association's cash balances as $491,194.00 as of October 2020 and $381,306.00 as of September 2019.

22. Throughout 2022, Ms. Oldenburg failed to provide the Association with a myriad of financially related documents, despite the fact that between February and June 2022, the Association's treasurer repeatedly asked for financial information.

23. No financial statements were provided for the first five months of 2022.

24. After months of delay and excuses, Ms. Oldenburg provided a cash flow statement in June 2022, confirming that the Association's collective cash balance as of December 31, 2021 was $537,902.81.

25. The Association continued to request information and financial statements from Ms. Oldenburg in accordance with PPS' obligations under the Agreement.

26. Ms. Oldenburg and PPS ignored these repeated requests.

27. On September 26, 2022, the Association requested a face-to-face meeting with PPS and Ms. Oldenburg. This meeting was scheduled for October 12, 2022.

28. On October 10, 2022, the Association e-mailed PPS and Oldenburg to confirm the meeting, and to request that on October 12, 2022, they provide financial documentation that included: the Association's insurance information; tax returns for the last five years; and financial data for the past twelve months.

29. PPS and Ms. Oldenburg cancelled the October 12, 2022 meeting on the day of the meeting.

30. The parties rescheduled this meeting for October 27, 2022.

31. Shortly before the October 27, 2022 meeting, PPS and Ms. Oldenburg informed the Association that its reserve accounts were exactly $150,000.00. The Association questioned this number as it was significantly lower than the reserve account numbers provided in earlier financial documents.

32. PPS and Ms. Oldenburg informed the Association that while they did not have immediate answers to the Association's queries concerning the exact amount of money in the

reserve accounts, they would look into the issue and provide the Association with the correct data. Ms. Oldenburg and PPS failed to provide this information.

33. On October 20, 2022, the Association requested that PPS and Ms. Oldenburg provide it with bank statements for the past three months, and asked whether the Association had more than two bank accounts. The Association requested this information by 5 p.m. on October 26, 2022, the day before the October 27, 2022 meeting.

34. PPS and Ms. Oldenburg failed to inform the Association as to whether it had more than two bank accounts. Further, PPS and Ms. Oldenburg never provided the requested bank statements.

35. On October 27, 2022, the Association met with PPS and Ms. Oldenburg.

36. During the October 27, 2022 meeting, PPS and Ms. Oldenburg offered to prepare full financial information data binders for each board member.

37. In an e-mail sent after the October 27, 2022 meeting, the Association requested PPS and Ms. Oldenburg produce the Associations' budget for 2023, which PPS was contractually obligated to provide.

38. PPS and Ms. Oldenburg never provided the financials or the 2023 budget.

39. On October 28, 2022, the Association issued notice of its termination of the Agreement, effective January 1, 2023.

40. On December 6, 2022, the Association's new property manager e-mailed PPS and Ms. Oldenburg a list of property and funds that needed to be forwarded, as required by the Agreement, including the most recent financial reports, bank statements, year-to-date general ledger, and prior tax returns.

41. On December 27, 2022, PPS and Ms. Oldenburg forwarded to the Association a November, 2022 financial report. This report contained several inaccuracies, and reflects the Association's cash balance having decreased by approximately $400,000.00 from the December 2021 financial statements.

42. In 2022, there were no large expenditures that could have accounted for a reduction of $400,000.00 from Association funds.

43. When questioned by the Association on this incredible disparity, Ms. Oldenburg failed to respond and failed to provide any explanation.

44. Bank account records and other information Carlson Farms has obtained so far show that Ms. Oldenburg and her father took approximately $400,000 from Carlson Farms' accounts, paid it to PPS, and then converted it to their own personal use.

45. Had the Association been made aware of the diminishing funds and its financial condition it would have taken immediate action to protect itself.

46. On December 30, 2022, PPS and Ms. Oldenburg informed the Association that they would provide the Association's financials by January 15, 2023.

47. PPS and Ms. Oldenburg did provide the Association with some financials by January 15, 2023, but the documentation contained significant omissions, including 2022 end of year financial information, and detailed income and expense sheets. To date, this information has never been provided.

48. PPS and Ms. Oldenburg have issued three checks in the total amount of $130,338.23 to the Association as part of their obligations to return the Association's money upon termination of the Agreement. Two of these checks were from the Association to the Association,

and drawn from Association accounts at Independent Financial Bank that were operated by PPS and Ms. Oldenburg, and the third was from Civitas Resources, Inc. The Association receives oil and gas royalties from Civitas Resources, Inc.

49. The checks were drawn from the following accounts: 1) $101,056.29 from Independent Financial Account No. 4123709); 2) $24,999.93 from Independent Financial Account No. 4123709; and 3) $4,282.01 from Civitas Resources, Inc.

50. The Independent Financial account number from which PPS and Ms. Oldenburg drew the checks for $101,056.29 and $24,999.93 does not match account numbers for Independent Financial bank statements previously provided by the Defendants.

51. On February 10, 2023, the Association issued a demand letter to PPS and Ms. Oldenburg, requesting they provide to the Association all of its funds and specifically listed financial information by 5 p.m. on Monday, February 13, 2023. The requested financial documents included: all taxes and tax returns filed on behalf of the Association from 2007 to 2022; a list of financial institutions and account numbers in which the Association has or has had deposits; all leases involving the Association; all oil and gas royalty statements; monthly financial statements; and monthly cashflow statements.

52. Ms. Oldenburg and PPS failed to produce the requested documents.

**FIRST CLAIM FOR RELIEF**
**11 U.S.C. §523(a)(2)(A) – False Representation & Actual Fraud**

53. The Association incorporates all preceding paragraphs by reference as if fully set forth herein.

54. 11 U.S.C. §523(a)(2)(A) provides that "[a] discharge…does not discharge an individual debtor from any debt - … for money, property, [or] services … to the extent obtained by – (A) false pretenses, a false representation, or actual fraud[.]"

55. Ms. Oldenburg made fraudulent misrepresentations of material facts when she informed the Association that it had approximately half a million dollars in cash reserves in its financial accounts.

56. Ms. Oldenburg made the representations knowing them to be false or with the awareness that she did not know whether the representations were true or false.

57. Ms. Oldenburg made the representations with the intent that the Association would rely on them.

58. Ms. Oldenburg made the representations with the intent to deceive the Association.

59. The Association reasonably relied on these misrepresentations when it decided to refrain from raising assessments in 2022, believing current cash reserves were plentiful.

60. The Association also reasonably relied on these misrepresentations by refraining from taking action sooner to recover Association funds and/or retake control of Association funds from Ms. Oldenburg and her company.

61. The Association was justified in relying on the misrepresentation as PPS and Oldenburg were its Agents, Officers and Property Managers.

62. The Association was damaged in excess of $100,000.00 as a result of its reliance on PPS' and Oldenburg's representations.

## SECOND CLAIM FOR RELIEF
## 11 U.S.C. §523(a)(4)

63. The Association incorporates all preceding paragraphs by reference as if fully set forth herein.

64. Debtor had a fiduciary duty to the Association. The terms of the Agreement Association and PPS and the provisions of CRS §38-33.3-101 *et. seq.* required Debtor to act in trust on behalf of the Association.

65. Debtor committed fraud while acting in her fiduciary capacity.

66. While directing the acts of PPS debtor breached her fiduciary duties to the Association.

67. Additionally Debtor caused PPS to incur debts to the Association by embezzlement and/or or larceny.

68. The Association possessed cash held in Financial Institutions in the approximate amount of $400,000.00 to $500,000.00, according to financial statements provided by Ms. Oldenburg.

69. Ms. Oldenburg owned and controlled multiple checking accounts with Independent Financial that were in the name of the Association and held Association funds (the "**Accounts**").

70. Ms. Oldenburg set up the Accounts in a way that precluded the Association from independently reviewing or accessing the Accounts.

71. Ms. Oldenburg proceeded to make multiple, unauthorized transfers of the Association's funds from the Accounts to herself. These transfers benefitted Ms. Oldenburg and

not the Association, and were not made for any legitimate purpose under the Agreement or otherwise.

72. Ms. Oldenburg intentionally and substantially interfered with the Association's ownership of its cash by preventing the Association from having access to the funds, refusing to return the funds after the Association demanded their return, and exceeding the extent and duration of authorized use of the Association's funds.

73. The Association did not consent to this interference.

74. The Association has suffered damages in the amount of the converted funds, which is to be proven at trial, plus costs, interest, and all other relief the Court deems appropriate.

75. Ms. Oldenburg knowingly exercised control over and/or took the Association's monies.

76. Specifically, Ms. Oldenburg set up the Accounts in a way that precluded the Association from independently reviewing or accessing the Accounts.

77. Ms. Oldenburg did so with the intent to permanently deprive the Association of the use and benefit of its property.

78. The Association suffered economic loss far in excess of $100,000.00.

79. Under C.R.S. § 18-4-405, the Association is entitled to receive three times the amount of its actual damages, plus costs and attorney fees.

WHEREFORE, the Association respectfully requests this Court:
1. Determine that the debt owed by Debtor to Association is non-dischargeable pursuant to 11 U.S.C. §§523(a)(2)(A) & (a)(4));
2. Award the Association damages in an amount to be proven at trial;

3. Award the Association its reasonable attorneys fees, costs, and treble the damages pursuant to C.R.S. § 18-4-405; and/or
4. For all other and further relief as this Court deems just and proper.

Dated: November 21, 2023

                        Respectfully submitted,

*/s/ Robertson B. Cohen*
Robertson B. Cohen, Esq. #35252
Cohen & Cohen, P.C.
1720 S. Bellaire St., Suite 205
Denver, CO 80222
Phone: (303) 933-4529
Fax: (866) 230-8268
rcohen@cohenlawyers.com
COUNSEL FOR PLAINTIFF